**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MICHAEL RUMBOLD, on his own behalf and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>NUTRIEN AG SOLUTIONS, INC.; CF INDUSTRIES HOLDINGS; KOCH AGRONOMIC SERVICES, LLC; YARA INTERNATIONAL ASA; YARA NORTH AMERICA, INC.; THE MOSAIC CO.; AND CANPOTEX LTD.,<br><br>*Defendants.* | Case No. ___________<br><br>**Jury Trial Demanded**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Michael Rumbold ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), files this Complaint against Defendants Nutrien Ag Solutions, Inc. ("Nutrien"); CF Industries Holdings ("CF Industries"); Koch Agronomic Services, LLC ("Koch"); Yara International ASA ("Yara International"); Yara North America, Inc. ("Yara North America" and, together with Yara International, "Yara"); The Mosaic Co. ("Mosaic"); and Canpotex Ltd. ("Canpotex") (collectively, "Defendants"). Plaintiff, upon personal knowledge as to the facts pertaining to himself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to Section 1 of the Sherman Act and demands a trial by jury on all matters so triable.

## I. NATURE OF THE ACTION

1. This lawsuit seeks both monetary and injunctive relief arising from Defendants' unlawful and ongoing agreement to fix the prices for nitrogen, phosphate and potassium (potash) fertilizers (individually and collectively, "NPK Fertilizers") sold and purchased throughout the

United States and its territories, from January 1, 2021 to the present day.

2. Defendants are direct competitors and among the largest producers and sellers of NPK Fertilizers in the United States.

3. Among the victims of the conspiracy are direct purchasers of NPK Fertilizers from the Defendants, including agricultural retailers, fertilizer mixers, members of farming associations, farm and planting partnerships/companies, and individual farmers/growers.

4. To implement their price-fixing conspiracy, beginning at least as early as January 1, 2021, the exact date being unknown to Plaintiff at this time, Defendants conspired to artificially inflate the price of NPK Fertilizers.

5. Defendants' unlawful agreement caused direct purchasers of NPK Fertilizers in the United States and its territories, including Plaintiff and the Class, to pay supra-competitive prices for NPK Fertilizers sold by Defendants in the United States and its territories from the period beginning no later than January 1, 2021 and running through the date on which the Class is certified (the "Class Period"), in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

## II. JURISDICTION AND VENUE

6. Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

8. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at

all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

9. Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 735 ILCS 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

10. This Court has personal jurisdiction over each Defendant because each Defendant throughout the U.S. and including in this District and the state of Illinois—has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District and the state of Illinois.

## III. PARTIES

### A. Plaintiff

11. Plaintiff Michael Rumbold is a farmer located in Wyoming, Illinois.

12. During the Class Period, Plaintiff purchased NPK Fertilizers in the United States or its territories at supra-competitive prices directly from one or more of the Defendants.

### B. Defendants

13. ***Nutrien Ag Solutions, Inc.*** is the global retail division, and wholly owned subsidiary of, Nutrien Ltd., with headquarters located at 3005 Rocky Mountain Avenue, Loveland, Colorado 80538. Nutrien is one of the largest manufacturers and distributors of nitrogen, phosphate and potash NPK Fertilizers in the United Sates.

14. ***Yara International ASA*** is a publicly traded company, listed on the Oslo Stock

Exchange (YAR.OL), with headquarters located at Drammensveien 131, 0277 Oslo, Norway. Yara International is a leading worldwide manufacturer of multiple varieties of nitrogen-based NPK Fertilizers. ***Yara North America, Inc.*** is a wholly-owned subsidiary of Yara International that is incorporated in Delaware with its principal place of business at 100 North Tampa Street, Suite 3800, Tampa, Florida 33602.

15. ***Koch Agronomic Services, LLC*** is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC, which is itself a wholly owned subsidiary of Koch Industries. Koch's headquarters is located at 4111 E 37th Street N, Wichita, Kansas, 67220. Koch is a leading manufacturer of nitrogen-based NPK Fertilizers throughout the United States.

16. ***CF Industries Holdings, Inc.*** is a publicly traded company, listed on the New York Stock Exchange (NYSE: CF), with headquarters located at 2375 Waterview Drive, Northbrook, Illinois 60062. CF Industries produces four nitrogen-based NPK Fertilizers for sale throughout the United States.

17. ***The Mosaic Company*** is a publicly traded company, listed on the New York Stock Exchange (NYSE: MOS), with headquarters located at 13830 Circa Crossing Drive, Lithia, Florida 33547. Mosaic is the world's leading integrated producer of concentrated phosphate and potash nutrients for use in NPK Fertilizers.

18. ***Canpotex Ltd.*** is a private jointly owned export company, equally owned by Nutrien, Ltd. (of which Defendant Nutrien is a subsidiary) and Mosaic Canada Corp Nutrition, LP (a wholly owned subsidiary of Defendant Mosaic). Canpotex Limited is headquartered at Suite 700, 409 – Third Avenue South, Saskatoon, Saskatchewan, Canada S7K 5R5. Canpotex is the world's leading producer of potash minerals used in NPK Fertilizers, and controls over 90% of the potash market.

## IV. FACTUAL ALLEGATIONS

### A. NPK Fertilizers Generally

19. Modern agriculture depends heavily on three essential nutrients that plants must have in large quantities: nitrogen, phosphorus, and potassium. These nutrients are supplied to crops through what farmers commonly call nitrogen, phosphate, and potash fertilizers—individually and in combination referred to as NPK Fertilizers (named after the chemical symbols for the nutrients they contain). Together they form the basis of most fertilizer programs around the world. Each plays a different role in plant growth, and each requires different raw inputs and is produced through distinct chemical and industrial processes.

20. NPK Fertilizers may be applied individually or in blended formulations depending on crop and soil requirements. Farmers sometimes use single-nutrient products when a specific nutrient is needed, but the nutrients are frequently combined into blended fertilizers containing nitrogen, phosphorus, and potassium in set proportions. These blends are typically labeled with three numbers indicating the percentage of each nutrient in the product.

#### *1. Nitrogen Fertilizers*

21. Nitrogen fertilizers are widely used in agriculture because nitrogen is the nutrient plants require in the greatest quantity. Nitrogen is a key component of chlorophyll, the molecule that enables photosynthesis, and it is also necessary for the formation of proteins and other biological compounds involved in plant growth. Adequate nitrogen supports the development of leaves and stems and is associated with faster vegetative growth and higher crop yields.

22. Most nitrogen fertilizers originate from industrial ammonia production using the Haber–Bosch process. In this process, nitrogen gas from the air is combined with hydrogen, typically derived from natural gas, under conditions of high temperature and pressure in the presence of a catalyst to produce ammonia. This ammonia serves as the principal intermediate used

to manufacture a variety of nitrogen fertilizer products.

23. Common nitrogen fertilizers include Urea, Ammonium nitrate, Ammonium sulfate, and Urea ammonium nitrate solution. These fertilizers vary in nitrogen concentration and form but each supplies nitrogen that plants absorb as nitrate or ammonium ions. They are commonly sold as small, typically round granules or "prills."

***2. Phosphate Fertilizers***

24. Phosphate fertilizers supply phosphorus, an essential nutrient required for several core plant functions. Phosphorus plays an important role in energy transfer within plant cells, including through molecules such as ATP, and contributes to early plant development, root formation, and the production of flowers and seeds. Adequate phosphorus availability is therefore associated with strong root systems and successful crop establishment.

25. Phosphate fertilizers are produced from phosphate rock, a naturally occurring mineral resource mined from geological deposits. After mining, the rock is processed chemically, typically by treatment with acids, to convert the phosphorus into forms that plants can readily absorb. This processing yields concentrated phosphate fertilizers used in commercial agriculture.

26. Common phosphate fertilizer products include Diammonium phosphate, Monoammonium phosphate, and Triple superphosphate. These fertilizers are generally manufactured as dry granules that can be transported in bulk and applied directly to fields or blended with other nutrients in compound fertilizers.

***3. Potash Fertilizers***

27. Potash fertilizers supply potassium, another primary plant nutrient required for healthy crop growth. Potassium helps regulate water movement within plant tissues, activates enzymes involved in metabolism, and supports plant tolerance to environmental stresses such as

drought or disease. Adequate potassium availability can contribute to improved crop quality and resilience.

28. Potash fertilizers are produced from naturally occurring potash ores formed from ancient, evaporated seas. These mineral deposits are mined or extracted from brines and then processed to separate potassium-bearing compounds suitable for agricultural use. The resulting products contain potassium in forms that plants can absorb as potassium ions.

29. The most widely used potash fertilizer is Potassium chloride, while Potassium sulfate is also used, particularly for crops that are sensitive to chloride. Potash fertilizers are typically sold as crystalline or granular solids that can be applied directly to fields or blended with other nutrients in compound fertilizers.

**B. The Market for NPK Fertilizers**

30. American farms cultivate over 220 million acres of cropland, driving an unrelenting demand for NPK Fertilizers. In 2024, the U.S. NPK Fertilizer market was estimated to be valued at almost $30 billion.

31. NPK Fertilizers are favored over other fertilizers because they supply the three macronutrients that crops need in the largest amounts, are highly concentrated, predictable, and fast-acting, allowing farmers to efficiently meet crop nutrient requirements. Unlike organic fertilizers, NPK Fertilizers provide precise nutrient content, are easy to store and transport, release nutrients more quickly into the soil, and are adaptable to most major crops and soil types, making them the primary choice for high-yield, modern agriculture.

32. In recent years, U.S. agriculture has consumed tens of millions of tons of NPK Fertilizers annually. In 2022 alone, U.S. farmers applied approximately 14.9 million metric tons of nitrogen nutrients, 6.5 million metric tons of phosphate nutrients, and 4.6 million metric tons of potassium nutrients to agricultural land.

33. Because fertilizer nutrients must be applied each growing season to maintain yields, farmers have limited ability to substitute NPK Fertilizers with alternate fertilizers or defer purchases without risking reduced crop production and soil nutrient depletion.

**C. Industry Consolidation and Market Concentration in NPK Fertilizers**

34. The NPK Fertilizer industry in the United States has long been characterized by significant consolidation and the industry experienced substantial consolidation following various market conditions dating back to the 1980s.

35. As a result, the number of firms in the NPK Fertilizer market has declined from 46 to 13 since the 1980s, and today each of the major nutrient industries is dominated by a single corporation: Mosaic dominates the American phosphate market, CF Industries commands the nitrogen sector, and Nutrien leads the North American potash market as the primary member of its duopoly with Mosaic.

***1. Consolidation in the Nitrogen Market***

36. From 1980 to 1990, the number of firms in the United States producing nitrogen fertilizers fell from 56 to fewer than 30. By 1998, consolidation had accelerated, and six dominant companies—Farmland, PotashCorp, Terra, CF Industries, Union Chemical, and Koch—controlled more than two-thirds of U.S. nitrogen capacity.

37. In 2000, Agrium—then one of the “Big Three” Canadian potash producers and a large agricultural retailer—became a major domestic nitrogen producer by acquiring Union Chemical’s plants. In 2003, Koch acquired most of Farmland’s nitrogen assets and became the largest U.S. ammonia producer at the time.

38. In 2010, CF Industries acquired Terra Industries, consolidating more than half of the nation’s nitrogen urea capacity and nearly 40% of its ammonia capacity and surpassing Koch

as the largest producer in the nitrogen sector.

39. By 2012, only thirteen nitrogen ammonia producers remained in the United States. Four companies—CF Industries, Koch, PotashCorp, and Agrium, in descending order—accounted for more than 75% of domestic nitrogen ammonia production.

40. In 2021, CF Industries accounted for an estimated 80% of ammonia, 56% of urea, and 52% of UAN fertilizer sales to American farmers, making it the dominant firm in the nitrogen sector.

***2. Consolidation in the Phosphate Market***

41. From 1980 to 1990, the number of firms mining phosphate rock in the United States declined from 25 to around 15. By 1998, almost all the phosphate rock output was concentrated in six firms: IMC Global, CF Industries, Cargill, PotashCorp, Agrifos, and Nu-Gulf, four of which were also dominant nitrogen producers.

42. IMC controlled roughly one-third of domestic phosphate fertilizer output, while Cargill and CF Industries each accounted for about one-sixth. The remaining third of the nation's phosphatic fertilizer output was produced almost entirely by companies with integrated mines.

43. In 2003, IMC and Cargill Crop Nutrition merged to form Mosaic as a Cargill-controlled subsidiary, creating the second-largest phosphate rock producer in the world and the largest manufacturer of phosphate and potassium fertilizers.

44. By 2012, only six companies—Mosaic, CF Industries, PotashCorp, Agrium, Monsanto, and J.R. Simplot—continued to mine phosphate rock in the United States. Mosaic, PotashCorp, and CF Industries together controlled approximately 90% of the country's output of both phosphate rock and phosphoric acid.

45. In 2014, Mosaic acquired CF Industries' phosphate fertilizer assets, gaining control

of more than half of U.S. phosphate rock capacity and roughly three-quarters of total North American phosphatic fertilizer output.

46. As of 2021, Mosaic produced more than 64% of the phosphate rock mined in the United States and around 80% of the phosphate fertilizers manufactured in North America. Either directly or through its subsidiaries and affiliates, Mosaic has been estimated to control more than 90% of phosphate-fertilizer sales to U.S. farmers.

***3. Consolidation in the Potash Market***

47. From 1980 to 1990, the number of potash producers in the United States declined from 14 to eight. By 1998, two companies operating in New Mexico's Carlsbad deposits—IMC and Mississippi Chemical—controlled around 85% of domestic potash and potassium-fertilizer output.

48. By 2012, only three companies produced potash domestically, including Mosaic and Intrepid. Almost all potash and potassium fertilizer consumed in the United States was imported from Canada, where production was controlled by PotashCorp, Mosaic, and Agrium.

49. In 2016, PotashCorp merged with Agrium to form Nutrien, which became the largest fertilizer manufacturer in the world. Following the merger, Nutrien controlled two-thirds of North American potash fertilizer capacity, along with 30% of the continent's nitrogen fertilizer capacity and 25% of its phosphate fertilizer capacity.

50. Today, Nutrien leads the North American potash market as the primary member of a duopoly with Mosaic. Nutrien produces between 55% and 60% of the potash mined in North America annually and controls an estimated 40% of potassium-fertilizer sales across the continent, while Mosaic produces about 35% of North America's potash output and controls an estimated 35% of the continent's potassium fertilizer sales.

### *4. Canpotex's Role in the Potash Market*

51. Canpotex is a Canadian potash export and marketing company jointly owned by Defendants Nutrien and Mosaic. Canpotex coordinates the offshore marketing, sales, and transportation of potash produced by Nutrien and Mosaic.

52. Canpotex was formed in 1972 as a joint export association for Canadian potash producers. Through Canpotex, its owners collectively market and distribute potash produced from their Canadian mines to customers outside of North America. Canpotex's five largest markets (Brazil, China, India, Indonesia, and Malaysia) account for approximately 75% of Canpotex's annual potash exports.

53. Canpotex operates an integrated export system that includes a fleet of specialized railcars, port terminal facilities, and dedicated ocean vessels used to transport potash overseas. This infrastructure allows Canpotex's members to export potash from Saskatchewan mines to overseas customers through a centralized transportation network.

54. By selling potash through a single export marketing organization, Canpotex provides its owners, Defendants Nutrien and Mosaic, with a mechanism for coordinating key aspects of potash sales, including export volumes and shipment schedules. Upon information and belief, Canpotex collects and manages competitively sensitive information concerning potash production, inventories, customer demand, pricing conditions, and shipment logistics.

55. Although Canpotex is not used to export potash into the United States, the use of Canpotex as a joint exporting and marketing organization generally creates opportunities for would-be competitors, Defendants Nutrien and Mosaic, to exchange competitively sensitive information and align their pricing and supply strategies in the United States.

56. In fall 2013, the American Antitrust Institute released a monograph which described a qualitative and quantitative analysis of the exercise of market power by “the few, large global producers of fertilizer inputs.” The report noted that fertilizer inputs were “conducive to anticompetitive coordination (*i.e*. collusion)” and concluded that “fertilizer producers have likely acted in a coordinated fashion to raise prices, to the detriment of competitors and consumers.” The monograph also discussed how, through Canpotex, producers engage in anticompetitive sharing of information on export prices and volumes.[1]

57. The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a significant plus factor that leads to a strong inference of active collusion. As described above, Defendants Mosaic and Nutrien are members of Canpotex, a Canadian export marketing agency through which Defendants collectively sell their Canadian potash into overseas markets. Canpotex allows Defendants to share a range of competitively sensitive data, including production data, pricing information, and sales volumes. The data Canpotex collects is data which would normally be kept confidential given its competitively sensitive nature. Moreover, Defendants’ employees display significant overlap with those of Canpotex. For example, Nutrien’s CEO was formerly the President and CEO of Canpotex.

**D. Prices for NPK Fertilizers Rose Precipitously During the Class Period and Remain Elevated**

58. The consolidation of control over NPK Fertilizer inputs and sales in the hands of the Defendants has given these firms significant market power in the NPK Fertilizer sector. Because of their substantial advantages in total capacity over existing and potential rivals, Defendants can materially influence national and regional NPK Fertilizer markets and affect price

[1] C. Robert Taylor and Diana L. Moss, “The Fertilizer Oligopoly: The Case For Global Antitrust Enforcement,” The American Antitrust Institute (Sept. 2013), *available at* https://www.antitrustinstitute.org/work-product/the-fertilizer-oligopoly-the-case-for-global-antitrust/.

levels.

59. Retailers, wholesalers, and producers in the NPK Fertilizer sector widely recognize CF Industries, Mosaic, and Nutrien as the "price leaders" for nitrogen, phosphate, and potassium fertilizers in U.S. markets, respectively.

60. Prior to the start of the conspiracy, NPK Fertilizer prices had been declining steadily for almost a decade. Price increases were typically transitory, and market forces corrected pricing (consistent with a competitive market). Even during the COVID-19 pandemic in 2020, NPK Fertilizer prices remained at average or slightly lower levels.

61. Contrary to these previous pricing patterns, NPK Fertilizer prices became significantly elevated during the Class Period as a result of Defendants' conduct. Beginning in 2021, the price of all major nutrients used in crop production—nitrogen, phosphorus, and potassium—skyrocketed at record-breaking rates and levels. This sharp price surge reflects the Defendants' collusive conduct.

62. As shown in the Figures below, available public pricing reveals a consistent pattern among NPK Fertilizers consisting of steep price increases from 2021 to 2022, followed by a brief decline in 2023, and renewed increases in 2024 that continue through the present.

**Figure 1. Producer Price Index for Fertilizers (2020-Present)**



**Figure 2. Producer Price Index for Nitrogen Fertilizers (2020-Present)**




**Figure 3. Producer Price Index for Phosphorous Fertilizers (2020-Present)**




**Figure 4. Producer Price Index for Potash (2020-2022) (Post-2022 Data Unavailable)**




63. Compared to September 2020 prices, the main nitrogen-based fertilizers—anhydrous ammonia, urea, or liquid nitrogen—increased 210%, 155%, and 159% respectively. Phosphorus-based fertilizers, diammonium phosphate ("DAP") and monoammonium phosphate ("MAP"), increased 100% and 125% respectively. Potash, the main source of potassium, rose over

134%.

### E. Defendants' Price Increases Cannot Be Explained by Demand Shocks or Rising Input Prices

64. Defendants were quick to blame the war in Ukraine for these price increases. But NPK Fertilizer prices were rising at alarming rates long before Russia invaded Ukraine and these price spikes were sufficiently suspicious to prompt both Senator Grassley and Farm Action to call on the U.S. Department of Justice "to investigate concerns raised by American farmers about possible anticompetitive activity and market manipulation in the fertilizer industry."[2]

65. Defendants also attributed rising prices to global shortages, yet their own documents refute any shortage claims by revealing that they had additional capacity they were not utilizing. For example, Yara International's 2021 third quarter report explicitly states that rising nitrogen costs had "[l]imited impact on finished fertilizer production to date."[3]

66. Likewise, Nutrien's 2020 annual report also reflected an ability to adjust production levels to meet demand, stating that, "due to historically low global ammonia prices we curtailed production … while maintaining flexibility to respond to improvements in the market condition."[4]

67. In fact, Nutrien's 2021 annual report bragged about its ability to increase potash production:

> We responded to extremely tight global market fundamentals and safely and efficiently increased our production by nearly 1 million tonnes [of potash]. We ramped up production in a very short time showcasing the flexibility and superior asset quality of our low-cost, integrated six-mine network. This represented a small

[2] Farm Action, *Farm Advocates Call for DOJ Investigation into Suspicious Spike in Fertilizer Prices* (Dec. 8, 2021), *available at* https://farmaction.us/2021/12/08/farm-advocates-call-for-doj-investigation-into-suspicious-spike-in-fertilizer-prices/.

[3] Yara International ASA 2021 Third quarter results, *available at* https://www.yara.com/siteassets/investors/057-reports-and-presentations/quarterly-reports/2021/3q-2021/yara-3q-2021-presentation.pdf/.

[4] Nutrien Annual Report 2020, *available at* https://cdn.sanity.io/files/ixv7nalm/production/bf661aa685bccdf831cfeae0e8a785e359e06fbd.pdf.

portion of our low-cost available production capacity.[5]

68. Defendants also blamed increased production and operating costs for the rising NPK Fertilizer prices. However, the enormous gains in their gross operating margins demonstrate that these price spikes were not justified by increased expenses.

69. As the following Figures illustrate, from Q1 2020 to Q1 2022, gross profit margins for CF Industries, Nutrien, and Mosaic increased by 176%, 102%, and 564%, respectively. While profit margins declined somewhat compared to their peak in 2022, Gross profit margins in Q4 2025 for CF Industries, Nutrien, and Mosaic were 96%, 68%, and 124% higher than they were in 2020 Q1.

**Figure 5. CF Gross Profit Margins**




[5] Nutrien 2021 Annual Report 2021, *available at* https://cdn.sanity.io/files/ixv7nalm/production/eab8f308cd5ed5a14587fba8a19f70c516458f08.pdf.

**Figure 6. Nutrien Gross Profit Margins**




**Figure 7. Mosaic Gross Profit Margins**




70. Moreover, Defendants' own financial reports tell us that there were no capacity shortages and that the precipitous increase of NPK Fertilizer prices was not attributable to supply chain shocks that resulted in increased input costs.

71. For example, while Nutrien's cost of goods sold in 2021 did increase by 58% compared to the previous year, its gross manufacturing margin went up 669% from 2020.[6] Nutrien

[6] Nutrien, *Nutrien Delivers Record Results and Expects Continued Growth in 2022* (Feb. 16, 2022), *available at* https://www.nutrien.com/news/press-releases/nutrien-delivers-record-results-and-expects-continued-growth-in-2022-1625.

also saw its net income multiply more than 13-fold, reporting nearly $2 billion in net income during the first three quarters of 2021, up from $143 million at the same time in 2020. The company's revenues topped $20.4 billion in 2021, compared to less than $17 billion in 2020.[7]

72. CF Industries saw its gross margin increase by 298% in 2021, though the cost of sales only accounted for 125% of that increase.[8] During the first three quarters of 2021, CF Industries earned nearly $4 billion in revenues, up from about $3 billion the previous year.[9]

73. Mosaic earned $966 million in net income during the first three quarters of 2021 on revenues of $8.5 billion compared to a $162 million loss in 2020 with $6.2 billion in sales.[10]

74. Yara International's 2021 annual report admitted that "increased price transparency can challenge fertilizer premiums," and then went on to attribute the 76% increase in U.S. earnings before interest, taxes, depreciation, and amortization (EBITDA) since last year to "high production margins in North America and slightly higher deliveries."[11]

75. When Farm Action analyzed the movement of fertilizer prices in 2021, it found that producers appeared to move prices in tandem, and that these price changes were not tied to demand or cost or any other legitimate business factor, but simply to the variation in grain prices.[12] "What actually appears to drive fertilizer prices," Farm Action concluded, "is a collusive calculation" based on "the farmers' ability to pay" and "the maximum profit which can be extracted from

---

[7] Soaring fertilizer prices boost profits for manufacturers (Dec. 9, 2021), *available at* https://capitalpress.com/2021/12/09/soaring-fertilizer-prices-boost-profits-for-manufacturers-copy/#google_vignette.

[8] CF Industries 2021 Annual Report, *available at* https://preprod.cfindustries.com/globalassets/cf-industries/media/documents/reports/annual-reports/cfindustriesannualreport2021.pdf.

[9] Soaring fertilizer prices boost profits for manufacturers (Dec. 9, 2021), *available at* https://capitalpress.com/2021/12/09/soaring-fertilizer-prices-boost-profits-for-manufacturers-copy/#google_vignette.

[10] *Id*.

[11] Yara Integrated Report 2021, *available at* https://www.yara.com/siteassets/investors/057-reports-and-presentations/annual-reports/2021/yara-integrated-report-2021.pdf.

[12] *See* Sarah Carden, *Big Fertilizer: Measuring the Impacts of Food and Farm System Concentration, Farm Action Special Report* (Jan. 19, 2022), *available at* https://farmaction.us/wp-content/uploads/2022/01/Big-Fertilizer_-Measuring-the-Impacts-of-Food-and-Farm-System-Concentration.pdf; Joe Maxwell, Pres., Family Farm Action Alliance, Letter to Dep't. of Just. (Dec. 8, 2021), *available at* https://farmaction.us/wp-content/uploads/2021/12/FFAA_DOJ_Fertilizer_Investigation_Final.pdf.

[them]."[13]

76. This inference was also supported by various academic and governmental analyses of fertilizer price trends. For example, a 2021 article by University of Illinois economists stated that "retail fertilizer prices are highly related to corn prices, suggesting that demand conditions and assessment of farmers' abilities to pay influence nitrogen fertilizer companies' pricing decisions."[14]

77. A December 2021 study by the Agricultural and Food Policy Center and Texas A&M University also concluded that, "[t]he suggestion that recent increases in the price of natural gas are the primary reason for recent increases in the prices of nitrogen products is 'highly suspect.'" Instead, "fertilizer prices are tracking closely with the improvement in corn prices, leading producers to question the influence of fertilizer companies."[15]

78. A 2015 analysis by USDA economists found that "natural gas and ammonia fertilizer prices were decoupled around the year 2008," and that ammonia fertilizer prices thereafter "became more highly correlated with the price of corn."[16]

79. A March 15, 2024, AGWEB article noted that:

> Despite global nitrogen fertilizer use having fallen almost 6 percent in 2022 due to the higher prices … as well as spot shortages of product in some regions, global urea prices did not fall back to earlier (2021) levels on a consistent basis until late in 2023 … some analysts have suggested that the industry's market power helped keep those prices higher for longer than otherwise might have been the case in a more competitive market.[17]

---

[13] *Id*.

[14] Illinois Farm Bureau, *Comment on USDA Request for Comments Regarding Access to Fertilizer: Competition and Supply Chain Concerns*, USDA Docket No. AMS-AMS-22-0027-1447 (May 12, 2022), *available at* https://www.regulations.gov/comment/AMS-AMS-22-0027-0952.

[15] FarmProgress, Higher fertilizer prices not linked to natural gas (Jan. 12, 2022), *available at* https://www.farmprogress.com/corn/higher-fertilizer-prices-not-linked-to-natural-gas.

[16] J. Beckman & S. Riche, *Changes to the Natural Gas, Corn, and Fertilizer Price Relationships From The Biofuels Era*, 47(4) Journal of Agricultural and Applied Economics, 494-509 (2015).

[17] AGWEB, *Concerns Grow Over Concentration in U.S. and Global Fertilizer Markets* (Mar. 15, 2024), *available at* https://www.agweb.com/opinion/concerns-grow-over-concentration-u-s-and-global-fertilizer-markets.

80. Defendants are well aware of the leverage they have over NPK Fertilizer customers and have used the cover of global crises to raise prices far beyond those demanded by necessity.

**F. Government Investigations into the NPK Fertilizer Industry**

81. In light of these serious threats to competition in the NPK Fertilizers market, among other things, in 2021 President Biden signed an Executive Order on Promoting Competition in America's Economy that directed USDA and other agencies to robustly enforce antitrust law and police U.S. markets, including in agriculture, where "[c]onsolidation in the agricultural industry is making it too hard for small family farms to survive."[18]

82. As part of executing that order, in March 2022, USDA initiated a Public Request for Information on Access to Fertilizer in order to document the concerns from agricultural producers regarding concentrated market power in the NPK Fertilizer market.

83. There were 1,494 comments submitted: 87% expressed concerns about high prices, 72% expressed concerns about the power of fertilizer manufacturers, 12% expressed concerns about restrictive contract practices, and 54% expressed concerns about economic or environmental harms.

84. In his comment, Tadd Nicholson, the Executive Director of the Ohio Corn & Wheat Growers Association, wrote:

> The number of fertilizer companies are so few that the word monopoly is not unfair. The US government has got to look into the market concentration to protect the integrity of the market, protect food security and protect farmers from being held hostage while we have no other options. Left unchecked the fertilizer industry will cause farmers to produce less food. These are very large companies that need to feel oversight of the government. Please investigate them because[n]o one else can.[19]

---

[18] *Promoting Competition in America's Economy,* Executive Order 14036 (July 9, 2021), *available at* https://www.federalregister.gov/documents/2021/07/14/2021-15069/promoting-competition-in-the-american-economy.

[19] Nicholson, TADD, Comments on Access to Fertilizer: Competition and Supply Chain Concerns, (Jun. 2022), *available at* https://www.regulations.gov/comment/AMS-AMS-22-0027-1078.

85. On October 28, 2025, The U.S. Senate Committee on the Judiciary held a hearing entitled, "Pressure Cooker: Competition Issues in the Seed and Fertilizer Industries." In her testimony before the Committee, Dr. Dianna Moss, Vice President & Director of Competition Policy at the Progressive Policy Institute, stated:

> These trends in fertilizer prices over the last 25 years signal a potentially troubling pattern. Numerous studies have established that price changes are not totally accounted for by changes in demand for crop commodities, or by changes in input costs, such as fuels needed to produce fertilizers (*e.g.*, natural gas for nitrogen). Instead, price patterns marked by an unexplainable price spike, followed by a price decrease, then another price spike, may well indicate anticompetitive coordination.
>
> These dynamics may reflect the formation of a tacit or explicit agreement among producers, followed by a breakdown due to a defection(s) from the agreement, followed by the reconstitution of the agreement. … Analysis of collusive behavior would look at the possibility of regional cartels or a global "super" cartel among fertilizer producers, or the more complex interaction between private companies, government sanctioned export cartels, and governments themselves.[20]

86. At that same Hearing, the President of the Iowa Corn Growers Association ("ICGA"), Mark Mueller, told the Committee that "[T]the massive increase in the cost of fertilizer is crushing corn growers in Iowa, and they aren't alone. Growers across the country are facing an impossible decision: buy fertilizer or stay solvent."[21] Mueller attributed the high NPK Fertilizer prices to two decades of unchecked consolidation in the U.S. NPK Fertilizer industry, which left only a few major companies controlling each market segment.[22]

87. According to Mueller, the effects of this market concentration had led to fertilizer

[20] Pressure Cooker: Competition Issues in the Seed & Fertilizer Industries Testimony of Dr. Diana Moss Vice President & Director of Competition Policy Progressive Policy Institute (Oct. 28, 2025) *available at* https://www.judiciary.senate.gov/imo/media/doc/57806f69-9cd2-0a74-ac7a-d2b236ce9e3b/2025-10-28_Testimony_Moss.pdf.

[21] Testimony of Mark Mueller President of the Iowa Corn Growers Association, U.S. Senate Committee Judiciary Hearing on Competition Issues in the Seed & Fertilizer Industries (Oct. 28, 2025), *available at* https://www.grassley.senate.gov/imo/media/doc/mark_mueller_testimony_senate_judiciary_committee_submitted_version.pdf.

[22] *Id*.

costs that far outpaced the price farmers received for their corn.[23] For example, the amount of corn sales required to purchase one unit of monoammonium phosphate (a fertilizer that combines phosphorous and nitrogen) had increased from an average of 136 bushels over the last five years to 230 bushels today, increasing the economic pressure on farmers, as fertilizer prices escalate while crop revenues remain comparatively stagnant.[24]

88. In December 2025, President Donald Trump issued an Executive Order directing the U.S. Attorney General and the Chairman of the Federal Trade Commission to each establish a Food Supply Chain Security Task Force within their respective agencies to aggressively investigate price-fixing and anti-competitive practices across the food sector.[25]

89. On January 21, 2026, United States Department of Agriculture Deputy Secretary, Stephen Vaden, held a videotaped conversation with the National Agricultural Law Center, in which he attributed high fertilizer prices to anticompetitive conduct, telling the audience that:

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay.[26]

90. In February 2026, both the ICGA and the Texas Corn Producers Association sent letters to U.S. Attorney General Pam Bondi seeking information about what the U.S. Department

---

[23] *Id*.
[24] *Id*.
[25] The White House, Fact Sheet: President Donald J. Trump Addresses Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain (Dec. 6, 2025), *available at* https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-addresses-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain/.
[26] A Conversation with USDA Deputy Secretary Stephen Vaden (Jan. 21, 2026), recording *available at* https://nationalaglawcenter.org/webinars/vaden/.

of Justice ("DOJ") is doing to pursue possible antitrust actions against the fertilizer industry.[27] As reported by Progressive Farmer, the letters reflect farmers' growing frustrations over lower crop returns while fertilizer prices continue to remain high.[28]

91. On March 4, 2026, Bloomberg reported that the DOJ Antitrust Division had opened a formal antitrust investigation into the pricing practices of major NPK Fertilizer producers to determine whether they colluded or coordinated to raise nitrogen, phosphate and potash fertilizer prices for U.S. farmers.[29] Bloomberg further reported that the investigation is looking at CF Industries, Koch Inc., Mosaic, Nutrien, and Yara International. Those companies are the dominant suppliers of fertilizer products in the United States.[30] Sources told reporters the government inquiry is examining whether coordinated pricing or supply decisions crossed the line into civil or criminal antitrust violations.[31]

92. On March 12, 2026, U.S. Senator Josh Hawley, the Chairman of the Subcommittee on Crime and Counterterrorism, wrote to CF Industries, Mosaic, Koch, Nutrien and Yara asking each to explain recent NPK Fertilizer price increases and noting that "the price run-ups American farmers are facing far outpace any disruption from recent events."[32] Among other things, Senator Hawley requested that each company identify with specificity any recent price changes and whether "your company communicated with any competitor regarding prices, production, inventory, allocations, capacity, market conditions, customer terms, or timing of announcements."

---

[27] Progressive Farmer, Report: DOJ Looking at Fertilizer Cos. (Mar. 5, 2026), *available at* https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/iowa-corn-growers-urge-doj-press? .

[28] *Id.*

[29] Bloomberg, *DOJ Probes US Fertilizer Market for Possible Price Fixing* (Mar. 4, 2026), *available at* https://www.bloomberg.com/news/articles/2026-03-04/doj-probes-us-fertilizer-market-for-possible-price-fixing.

[30] *Id.*

[31] FarmProgress, *DOJ probes U.S. fertilizer market for possible price fixing* (Mar. 4, 2026), *available at* https://www.farmprogress.com/farm-business/doj-probes-u-s-fertilizer-market-for-possible-price-fixing.

[32] *See e.g.*, Letter from Senator Josh Hawley to Christopher Bohn Presiden and Chief Executive Officer, CF Industries Holding Inc. (Mar. 12, 2026) *available at* https://www.hawley.senate.gov/wp-content/uploads/2026/03/2026-03-12-Letter-to-Fertilizer-Companies-CF-Industries-Holdings-Inc.pdf.

93. At the same time, Senator Hawley wrote to Attorney General Pamela Bondi, noting the high level of concentration in the NPK Fertilizer market and requesting that she, among other things, "open or expand a formal investigation into pricing, output, allocation, and communications practices among fertilizer producers serving the U.S. market."[33]

### G. The Structure and Characteristics of the Market for NPK Fertilizers Support the Existence of a Conspiracy

94. Economic literature makes clear that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred. While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

95. ***Concentration of supply side:*** As previously discussed above in Section IV. C., the Defendants are among the largest producers of NPK Fertilizers sold in the United States and together control over 80% of the North American nitrogen fertilizer market and over 90% of the North American phosphate and potash markets. Because the manufacture of NPK Fertilizers is highly concentrated, with the Defendants controlling the vast majority of production, the NPK Fertilizer market is highly susceptible to collusion.[34]

96. ***Standardization:*** NPK Fertilizers are highly standardized because their active ingredients—nitrogen, phosphate, and potassium—are basic chemical components that meet established nutrient specifications.

97. NPK Fertilizer purchasers generally treat these inputs as interchangeable

[33] Letter from Senator Josh Hawley to Hon. Pamela Bondi, Attorney General (Mar. 12, 2026), *available at* https://www.hawley.senate.gov/wp-content/uploads/2026/03/2026-03-12-Letter-to-DOJ-re-Fertilizer-Companies.pdf.

[34] *See* https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding ("Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories.").

commodities, regardless of the specific manufacturer or source. This interchangeability reduces differentiation among suppliers and shifts competition primarily to price rather than quality, service, or branding.

98. Because NPK Fertilizers are commodity products, prices are highly transparent, and market participants can readily observe each other's pricing and production decisions. This transparency, combined with the fungibility of the product, facilitates coordination among the Defendants, who can more easily align prices, adjust output collectively, or maintain parallel pricing structures without needing formal agreements.

99. In addition, standardization simplifies the logistics and distribution of NPK Fertilizers. Farmers can source inputs from multiple suppliers without concern for differences in product effectiveness, allowing Defendants to exert influence over price levels and the flow of products through retail and wholesale channels.

100. These characteristics create an environment in which market coordination is more feasible and anti-competitive pricing behavior is easier to sustain.

101. ***Opportunities to collude at trade association meetings:*** Collusion also may be facilitated by trade associations. Here, Defendants have had multiple opportunities to collude through trade associations to which they belong and serve as board members.

### *1. The International Fertilizer Association*

102. All six Defendants are active members of the International Fertilizer Association ("IFA"),[35] a global fertilizer association, headquartered in Paris, France.[36] Bruce Bohn (CF Industries), Bruce Bodine (Mosaic), Kenneth Seitz (Nutrien), and Svein Tore Holsether (Yara

[35] https://www.fertilizer.org/about-ifa/our-members/.
[36] https://www.fertilizer.org/about-ifa/contact-us/.

International), are also members of IFA's Board.[37] During the Class Period, IFA sponsored a number of in-person trade events including:

- 2021 Annual Conference—September 27-29, 2021, Lisbon, Portugal
- 2022 Annual Conference—May 30-June 1, 2022, Vienna, Austria
- 2022 Asia Pacific Crossroads—October 5-7, 2022, Singapore
- 2022 Strategic Forum— October 31-November 2, 2022, Washington, D.C.
- 2023 Annual Conference—May 22-24, 2023, Prague, Czech Republic
- 2023 Global Markets Conference—July 11-12, 2023, London, UK
- 2023 IFA Crossroads—October 10-12, 2023, Bangkok, Thailand
- 2023 IFA Strategic Forum—November 28-30, 2023, Doha, Qatar
- 2024 Global Sustainability Conference—March 6-8, 2024, Amsterdam, Netherlands
- 2024 Annual Conference— May 20-22, 2024, Singapore
- 2024 Global Markets Conference—July 9-11, 2024, London, UK
- 2024 IFA Crossroads—October 8-10, 2024, Hong Kong, China
- 2024 IFA Strategic Forum—November 19-21, 2024, Madrid, Spain
- 2025 Cultivating Tomorrow—April 1-3, 2025, Barcelona, Spain
- 2025 IFA Annual Conference—May 12-14, 2025, Monaco
- 2025 Global Markets Conference—July 1-2, 2025, London, UK
- 2025 IFA Crossroads—October 7-9, 2025, Bangkok, Thailand
- 2025 IFA Strategic Forum—November 18-20, 2025, Rabat, Morocco

### *2. The Fertilizer Institute*

103. CF Industries, Koch, Mosaic, Nutrien, and Yara North America, are all members and Board members, of The Fertilizer Institute ("TFI"), a national fertilizer industry organization headquartered in Arlington, Virginia.[38] In addition to offering exclusive members-only "market volatility information and resources,"[39] during the Class Period, TFI sponsored a number of in-person trade events including:

- 2021 Annual Business Conference—April 25-28, 2021, Dallas, Texas
- 2021 World Fertilizer Conference—September 20-22, 2021, Orlando, FL
- 2021 T3 Fertilizer Conference—November 3-5, 2021, Virtual
- 2022 InfoAG Conference—July 26-27, 2022, ST. Louis, MO
- 2022 World Fertilizer Conference—September 11-14, 2022, Washington, DC
- 2022 T3 Fertilizer Conference—November 7-9, 2022, Houston, TX

[37] https://www.fertilizer.org/about-ifa/structure-governance/our-board/.
[38] https://www.tfi.org/about-us/leadership/.
[39] https://www.tfi.org/insights/market-intelligence-insights/.

- 2023 Annual Business Conference—February 16–18, 2023, Orlando, FL
- 2023 Fluid Fertilizer Foundation Forum & Annual Meeting—February 19-21, 2023, Phoenix, AZ
- 2023 TFI Banquet Commodity Classic—March 9, 2023, Orlando, FL
- 2023 Biostimulant Committee DC Fly-In—April 17-18, 2023, Washington, DC
- 2023 InfoAG Conference—June 27-28, 2023, Indianapolis, IN
- 2023 World Fertilizer Conference—October 2–5, 2023, Washington, DC
- 2023 TFI Post-Conference Advocacy Fly-In—Oct. 4, 2023, Washington, DC
- 2023 Agricultural Nutrients Policy Counsel Workshop—October 16-17, 2023, Columbus, OH
- 2023 T3 Fertilizer Conference—November 13-15, 2023, New Orleans, LA
- 2024 Ford West Leadership Academy—January 15-18, 2024, Houston, TX
- 2024 Annual Business Conference —February 26-29, 2024, Orlando, FL
- 2024 Fertilizer Research Forum—March 18-20, 2024, Fort Worth, TX
- 2024 FERT Foundation Nutrients for Life Gold Tournament at the Southwestern Fertilizer Conference—July 14, 2024, Nashville, TN
- 2024 Agronomy Conference & Expo—August 12-14, 2024, Indianapolis, IN
- 2024 World Fertilizer Conference—September 16–18, 2024, Washington, DC
- 2024 TFI Market & Logistics Conference—November 18-20, 2024, Charlotte, NC
- 2024 Fluid Fertilizer Workshop—December 9, 2024, Maumee, OH
- 2025 Ford West Leadership Academy—January 6-9, 2025, Houston, TX
- 2025 Annual Business Conference—March 16-19, 2025, Orlando, FL
- 2025 FERT Foundation Nutrients for Life Golf Tournament at the Southwestern Fertilizer Conference—July 13, 2025, Nashville, TN
- 2025 Agronomy Conference & Expo—August 4–6, 2025, Indianapolis, IN
- 2025 World Fertilizer Conference—September 15–17, 2025, Chicago, IL
- 2025 TFI Market & Logistics Conference—November 10–12, 2025, Charlotte, NC
- 2025 Fluid Fertilizer Workshop—November 18, 2025, Dinuba, CA
- 2026 Annual Business Conference—February 16–18, 2026, Orlando, FL

### *3. Fertilizer Canada*

104. All six Defendants are members of Fertilizer Canada ("FC"), a Canadian fertilizer industry organization headquartered in Ottawa, Ontario.[40] CF Industries, Koch Fertilizer Canada, ULC, Mosaic, Nutrien, and Yara North America are members of the Board of FC.[41] FC is an organization representing producers, manufacturers, wholesale and retail distributors of nitrogen,

[40] https://fertilizercanada.ca/about/.
[41] https://fertilizercanada.ca/about/.

phosphate, potash and sulfur fertilizers.[42] During the Class Period, FC sponsored a number of in-person trade events including:

- 2023 Annual conference—August 14-16, 2023, Vancouver, BC
- 2023 Canadian Fertilizer Products Forum—November 7-8, 2023, Ottawa, ON
- 2024 Annual Conference—August 19-21, 2024, Montreal, QC
- 2024 Canadian Fertilizer Products Forum—November 13-14, 2024, Ottawa, ON
- 2025 Annual Conference—August 18-20, 2025, Kelowna, BC
- 2025 Canadian Fertilizer Products Forum—October 21-22, 2025, Ottawa, ON
- 2026 Annual Conference—September 14-16, 2026, Charlottetown, PEI

#### *4. The Sulphur Institute*

105. Nutrien, Mosaic, and Koch Sulfur Products Company L.L.C., are all members[43] and Board members[44] of The Sulfur Institute ("TSI"), a global association for sulfur and sulfuric acid professionals, based in Washington, D.C.[45] During the Class Period, TSI sponsored a number of in-person trade events including:

- 2022 Sulphur World Symposium—May 9-11, 2022, Tampa, FL
- 2023 Sulphur World Symposium—April 25-27, 2023, Edinburgh, Scotland
- 2024 Sulphur World Symposium—April 2-4, 2024, Charleston, SC
- 2025 Sulphur World Symposium—April 8-10, 2025, Florence, Italy
- 2025 Executive Committee Meeting—September 16, 2025, Chicago, IL

#### *5. The Agricultural Retail Association*

106. Both Koch and Mosaic are members of the Agricultural Retail Association ("ARA"), an industry trade group based in Arlington, Virginia.[46] Additionally, Nathan Packer (Nutrien) and Bob Ness (Mosaic), are members of the Board of ARA.[47] In addition to semi-annual in-person meetings of ARA committees,[48] during the Class Period, ARA hosted a number of in-

[42] https://fertilizercanada.ca/about/.
[43] https://www.sulphurinstitute.org/about-tsi/member-companies/.
[44] https://www.sulphurinstitute.org/about-tsi/board-of-directors/.
[45] https://www.sulphurinstitute.org/about-tsi/mission-and-programs/.
[46] https://www.aradc.org/members.
[47] https://www.aradc.org/board.
[48] https://www.aradc.org/get-involved.

person trade events including:

- 2021 Conference & Expo—November 30-December 2, 2021, San Antonio, TX
- 2022 Conference & Expo—November 29-December 1, 2022, San Diego, CA
- 2023 Conference & Expo—November 28-30, 2023, Orlando, FL
- 2024 Conference & Expo—December 3-5, 2024, Houston, TX
- 2025 Conference & Expo—December 2-4, 2025, Salt Lake City, UT
- 2026 Conference & Expo—December 1-3, 2026, Austin, TX

#### *6. The Fertilizer Industry Round Table*

107. Both David Bilby (CF Industries) and Shawn McGreevy (Koch), are Board members of the Fertilizer Industry Round Table ("FIRT"), a fertilizer trade group.[49] Gary Vogen (Yara North America), previously served as a Board member of FIRT.[50] FIRT hosts an annual meeting, in partnership with TFI.[51]

108. ***High barriers to entry:*** There are also high barriers to becoming a manufacturer of NPK Fertilizers because Defendants maintain control over NPK Fertilizer production and sales through a moat of entry barriers created by their control over inputs and distribution channels.

109. Incumbents own the overwhelming majority of high-grade potash and phosphate rock reserves in North America. Opening a new mine would require substantial at-risk expenditures on exploration, large upfront capital outlays for construction, and years of lead time before production could begin. There is also limited know-how and talent outside the industry to successfully execute such projects. Nutrien's 2025 Annual Report noted that "[b]uilding new [potash] production capacity requires significant capital and time to bring online. The expected cost for a greenfield project, including infrastructure, ranges up to $7 billion and requires a minimum of 10 years."[52]

---

[49] http://www.firt.org/about/current-board.
[50] http://www.firt.org/about/past-member.
[51] http://www.firt.org/about.
[52] Nutrien 2024 Annual Report, *available at* https://cdn.sanity.io/files/ixv7nalm/production/116378e3b1092ebacea8c2f8caa3b6badda38b72.pdf.

110. Moreover, a new phosphate or potassium fertilizer plant would face uncertainty in sourcing raw minerals or secondary feedstocks, such as phosphoric acid, necessary for production.

111. Even if a new entrant could source raw materials and manufacture fertilizer at a competitive cost, it would still need access to distribution outlets, transportation, and storage. For example, the CEO of Agrium—later CEO of Nutrien—emphasized using the company's "$5 billion warchest" to consolidate the fragmented U.S. farm retail sector.[53] Today, Nutrien is the largest farm retailer in America, with more than 1,500 stores across 45 states, capturing over 20% of agricultural retail sales nationwide. Most fertilizer sold in Nutrien retail outlets in the U.S. and Canada is sourced from its own production.

112. A similar situation exists in the nitrogen industry, where CF Industries has granted CHS—one of the nation's largest nitrogen wholesalers—an 11% ownership interest in its domestic nitrogen plants and a guaranteed supply of up to 1.1 million tons of urea and 580,000 tons of UAN solution annually.

113. These exclusionary relationships make it substantially harder for new NPK Fertilizer producers to enter the market. The USDA has received complaints from upstart manufacturers about long-term supply contracts and large minimum order requirements that foreclose competition and limit diversification of retail suppliers.

114. In addition to customer foreclosure, new entrants face restricted access to logistics channels. NPK Fertilizer is seasonal and bulky, making pipeline, rail, and water transport capacity—and access to storage in key consumption regions—essential.

115. In the potash industry, freight rail is the primary cost-effective method for

---

[53] Rod Nickel, *Merged Fertilizer Firm Nutrien Eyes U.S. Farm Suppliers as Cash Pile Builds*, Reuters (Nov. 8, 2017), https://www.reuters.com/article/business/merged-fertilizer-firm-nutrien-eyes-u-s-farm-suppliers-as-cash-pile-builds-idUSL1N1NE1D1/.

transporting fertilizer from Saskatchewan to U.S. ports and inland markets. Lake vessel transport from Thunder Bay, Ontario, is often the cheapest method to reach the Eastern United States. However, Nutrien, Mosaic—and their jointly-owned exporting subsidiary, Canpotex—control nearly all marine terminals capable of handling dry bulk fertilizer from Saskatchewan.

116. Similar transport barriers exist in the nitrogen and phosphate sectors. Ammonia, for example, can only be moved by pipeline, refrigerated barges, or specialized tank railcars. Pipeline transport is the cheapest and safest option, followed by barges and then rail. Dominant nitrogen producers effectively control these methods.

117. There is only one ammonia pipeline system in the United States, owned by NuStar Energy. All operating injection points are controlled by CF Industries, Koch, and Mosaic, except for two owned by Dow Chemical and NuStar. Nearly all delivery points are controlled by CF Industries and Koch.

118. Concentrated control extends to storage. USDA staff have reported that three companies control roughly 90% of leasable NPK Fertilizer storage capacity in the Midwest, limiting rivals' access to inputs.

119. Another barrier to entry is the sheer economic power of Defendants. They can shift supplies between domestic and export markets to manipulate supply and demand and deploy logistics networks and financial resources to sell at cut-rate prices wherever a competitor challenges their dominance.

120. Mosaic has been accused by corn growers of supporting anti-dumping and countervailing duties in 2021 to limit competition from imported phosphate, creating what growers described as an "insurmountable tariff barrier." Only 15% of phosphate imports entered the U.S. without tariffs, potentially adding $480 to $640 million in costs for farmers. CF Industries similarly

supported duties on urea ammonium nitrate from Russia and Trinidad.

121. By concentrating economic power, Defendants make it extremely difficult to plan or finance new NPK Fertilizer capacity. These factors collectively create an environment that is unwelcoming to new NPK Fertilizer producers.

122. ***Inelastic demand:*** Demand for NPK Fertilizers is inelastic. Industries with inelastic demand, such as the NPK Fertilizers manufacturing industry, are more susceptible to cartel formation and behavior than industries with elastic demand.

123. Farmers rely on fertilizer inputs as essential components of producing crops. Because crop yields depend on adequate nutrient application each season, farmers cannot significantly reduce fertilizer usage when prices rise without risking lower yields and profitability.

124. A lack of substitute goods may be a characteristic of inelastic demand. NPK Fertilizers cannot be interchanged freely with other goods—although there are other fertilizers, NPK Fertilizers are unique because they provide precise, balanced nutrients, rapid soil availability, and broad crop adaptability, making them distinct from other fertilizers.

125. Customers similarly do not view NPK Fertilizers as interchangeable with other fertilizers.

126. ***Unconcentrated demand side:*** The unconcentrated nature of the demand side of the NPK Fertilizers market and lack of buyer power sufficient to stimulate competition also makes this market susceptible to collusion. Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing agreement carries large penalties.

127. ***History of antitrust violations:*** Finally, The NPK Fertilizers industry has a history

of antitrust scrutiny. In 2008, U.S. purchasers filed antitrust lawsuits alleging that major producers—including companies such as Mosaic, PotashCorp, and Agrium—coordinated production and sales to keep potash prices artificially high.[54] Plaintiffs alleged producers shared market information, allocated volumes, and restricted output as part of a "tight-knit global cartel."[55] Several companies later settled private antitrust claims, with settlements around $43.75 million each from firms such as Mosaic and PotashCorp (without admitting wrongdoing).[56]

## V. ANTITRUST IMPACT AND DAMAGES TO THE PLAINTIFF AND THE CLASS

128. Because of the Defendants' anticompetitive conduct: (1) competition in the NPK Fertilizers market has been reduced or eliminated, (2) prices for NPK Fertilizers have been maintained at supracompetitive levels, and (3) United States purchasers of NPK Fertilizers have been deprived of the benefit of price competition.

129. As described herein, during the Class Period, Plaintiff directly purchased NPK Fertilizers from at least one of the Defendants.

130. As a result of the Defendants' anticompetitive conduct, Plaintiff and Class members paid more for NPK Fertilizers than they otherwise would have and thus suffered antitrust injury and damages. The overcharges paid by Plaintiff and members of the Class for NPK Fertilizers constitutes antitrust injury and harm to competition under the federal antitrust laws.

## VI. CLASS ACTION ALLEGATIONS

131. Plaintiff brings this action on behalf of himself and as a class action under Rules

---

[54] *See* Potash Producers Must Face Buyers' U.S. Antitrust Lawsuit (July 27, 2012), *available at* https://www.fertilizerworks.com/news/potash-producers-must-face-buyers%E2%80%99-us-antitrust-lawsuit (discussing *Minn-Chem Inc. v. Agrium Inc.*, No. 10-1712 (7th Cir. 2008).

[55] *See* Potash Price-Fixing Conspiracy Alleged (Sept. 12, 2008), *available at* https://www.courthousenews.com/potash-price-fixing-conspiracy-alleged/.

[56] The Mosaic Company Announces Settlement of Potash Antitrust Litigation (Jan. 30, 2013), *available at* https://www.prnewswire.com/news-releases/the-mosaic-company-announces-settlement-of-potash-antitrust-litigation-189020521.html.

23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States and its territories who purchased NPK Fertilizers directly from any of the Defendants or their subsidiaries or affiliates during the period beginning no later than January 1, 2021 until the date on which a class is certified in this case. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, and the Court and its staff.

132. ***Numerosity.*** While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the class size is so numerous that joinder is impracticable given Defendants' substantial nationwide presence.

133. ***Commonality.*** Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making relief with respect to the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a) Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of NPK Fertilizers in the United States and its territories;

(b) The identity of the participants in the alleged conspiracy;

(c) The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

(d) Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(e) Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(f) The effect of the alleged conspiracy on the price of NPK Fertilizers during the Class Period;

(g) Whether the Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

(h) The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(i) The appropriate class-wide measure of damages.

134. ***Typicality.*** Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for NPK Fertilizers from Defendants.

135. ***Adequacy.*** Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

136. ***Predominance.*** The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

137. ***Superiority.*** Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of

separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII. INTERSTATE TRADE AND COMMERCE

138. Billions of dollars of transactions in NPK Fertilizers are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

139. Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

140. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for NPK Fertilizers in the United States.

141. Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of NPK Fertilizers sold in the United States, the prices of NPK Fertilizers would have been determined by a competitive, efficient market.

## VIII. ANTITRUST INJURY

142. Defendants' antitrust conspiracy had the following effects, among others:

(a) Price competition has been restrained or eliminated with respect to the pricing of NPK Fertilizers;

(b) The prices of NPK Fertilizers have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c) Purchasers of NPK Fertilizers have been deprived of the benefits of free and open competition; and

(d) Purchasers of NPK Fertilizers paid artificially inflated prices.

143. The purpose of the conspiratorial and unlawful conduct of Defendants was to fix, raise, stabilize, and/or maintain the price of NPK Fertilizers.

144. The precise amount of the overcharge impacting the prices of NPK Fertilizers paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

145. By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for NPK Fertilizers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX. CLAIMS

### Count I: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade)

146. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

147. Beginning as early as January 1, 2021, the exact date being unknown, until the date on which any Class is certified, Defendants entered into and engaged in a contract, combination, or conspiracy with regard to NPK Fertilizers in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

148. The contract, combination, or conspiracy consisted of an agreement among the Defendants to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for NPK Fertilizers in the United States and its territories.

149. In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including the following:

(a) Exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of NPK Fertilizers sold in the United States and its territories;

(b) Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of NPK Fertilizers, including surcharges on NPK Fertilizers sold in the United States and its territories; and

(c) Participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they reached.

150. Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of NPK Fertilizers.

1. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for NPK Fertilizers has been restrained, suppressed, and/or eliminated;

(b) Prices for NPK Fertilizers provided by Defendants have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

(c) Plaintiff and members of the Class who purchased NPK Fertilizers from Defendants have been deprived of the benefits of free and open competition.

151. Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for NPK Fertilizers purchased from Defendants than they would have paid and will pay in the absence of the conspiracy.

152. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

153. Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants to prevent and restrain the violations alleged herein.

## X. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B. The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and that acts done in furtherance thereof by Defendants be adjudged to have been *per se* violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, and from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E. That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be

permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F. That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XI. JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: March 18, 2026

Respectfully submitted,

*/s/ Gary M. Klinger*
Gary M. Klinger
**MILBERG PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Linda P. Nussbaum*
**NUSSBAUM LAW GROUP, P.C.**
1225 Franklin Avenue, Suite 325
Garden City, NY 11530
Telephone: (917) 438-9189
Email: lnussbaum@nussbaumpc.com

James E. Cecchi*
Zachary Jacobs*
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Email: jcecchi@carellabyrne.com
Email: zjacobs@carellabyrne.com

Michael E. Criden*
Lindsey C. Grossman*
**CRIDEN & LOVE, P.A.**

2020 Salzedo Street, Suite 302
Coral Gables, Florida 33134
Telephone: (305) 357-9000
Email: mcriden@cridenlove.com
Email: lgrossman@cridenlove.com

**Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Proposed Class*